**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 05-CR-50-LRR |
| vs. | **SENTENCING MEMORANDUM** |
| DANIEL P. MITCHELL, | |
| Defendant. | |

## *I. INTRODUCTION*

In this sentencing, the court must decide four important legal issues in calculating Defendant Daniel P. Mitchell's advisory Sentencing Guidelines range.[1] The court must decide whether to impose (1) a seven-level increase pursuant to USSG §2F1.1(b)(1)(H)

---

[1] Although application of the Sentencing Guidelines is no longer mandatory, [in the Eighth Circuit] district courts are still required to consult the Guidelines and take them into account in calculating a defendant's sentence. A district court must calculate a defendant's advisory Guidelines sentencing range based on his total offense level, criminal history category, and any appropriate departures. The court may also vary from the advisory Guidelines range based on the factors set forth in 18 U.S.C. § 3553(a) as long as the resulting sentence is reasonable. Proper application of the Guidelines "remains the critical starting point" for fashioning a reasonable sentence under § 3553(a), and a sentence within the properly calculated Guidelines range is presumed to be reasonable.

*United States v. Jeremiah*, 446 F.3d 805, 807 (8th Cir. 2006) (citing, in part, *United States v. Booker*, 543 U.S. 220, 264 (2005)).

(1998) for an amount of loss of more than $120,000 but less than $200,000; (2) a two-level increase pursuant to USSG §2F1.1(b)(2)(B) for an offense that involved a scheme to defraud more than one victim; (3) a two-level increase pursuant to USSG §2F1.1(b)(4)(B) for an offense that involved a violation of a judicial process; and (4) a two-level increase pursuant to USSG §3C1.1 for obstruction of justice.

## II. PROCEDURAL BACKGROUND

The complex procedural history of this case is set forth in the court's Order on Defendant's Motion for Judgment of Acquittal or New Trial ("Post-Trial Motions Order"). *See United States v. Mitchell*, No. 05-CR-50-LRR, 2006 WL 20583, at *1-*2 (N.D. Iowa Jan. 4, 2006). Although Defendant was charged in a two-count Indictment on May 19, 2005, this sentencing only concerns Defendant's conviction on Count 1.[2]

Count 1 charged Defendant with fraudulent concealment of assets in connection with a bankruptcy proceeding, in violation of 18 U.S.C. § 152(1). On August 31, 2005, a jury convicted Defendant of fraudulently concealing his total income from January 1, 1999, through about July 11, 2000, in a voluntary Chapter 7 bankruptcy proceeding he filed on July 12, 2000 in the United States Bankruptcy Court for the Northern District of Iowa.

On March 3, 2006, the United States Probation Office ("USPO") prepared a Presentence Investigation Report ("PSIR"). On April 11, 2006, the PSIR was revised. On May 5 and 10, 2006, the government and Defendant filed their respective sentencing memoranda. On May 18, 2006, the government filed a supplement to its sentencing memorandum.

---

[2] In the Post-Trial Motions Order, the court granted Defendant's Motion for New Trial as to Count 2 and denied Defendant's Motion for Judgment of Acquittal as to Count 2. *Mitchell*, 2006 WL 20583, at *14. The court's denial of Defendant's Motion for Judgment of Acquittal on Count 2 is presently on interlocutory appeal to the Eighth Circuit Court of Appeals.

2

On May 19, 2006, and June 7, 2006, sentencing proceedings in this matter commenced at a hearing ("Hearing") held before the undersigned. Assistant United States Attorney Ian Thornhill represented the government. Defendant was personally present and represented by Attorney Stanley Roush. The Hearing is scheduled to conclude on July 6, 2006, at 10 a.m. When the Hearing resumes, the court shall pronounce sentence in a manner consistent with the instant Sentencing Memorandum.

## IV. THE MERITS

### A. Amount of Loss

The first issue before the court is whether the court should impose a seven-level increase pursuant to USSG §2F1.1(b)(1)(H) (1998)[3] for an amount of loss of more than $120,000 but less than $200,000.

### 1. The Law

In pertinent part, USSG §2F1.1(b)(1)(H) provides:

> §2F1.1. Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States
> (a) Base Offense Level: 6
> (b) Specific Offense Characteristics
>   (1) If the loss exceeded $2,000, increase the offense level as follows:
>     Loss (Apply the Greatest)        Increase in Level
>     (A)    $2,000 or less              no increase

---

[3] USSG §2F1.1 (1998) was deleted by consolidation with USSG §2B1.1 effective November 1, 2001. USSG §2B1.1 (2005) provides for a ten-level increase for losses of more than $120,000 but less than $200,000. Because the Sentencing Guidelines in effect at the time of sentencing are harsher than those in effect at the time Defendant committed his crime, the court is obligated to consult the more lenient version. USSG §1B1.11(b)(1); *see, e.g., United States v. Wintermute*, 443 F.3d 993, 1004 (8th Cir. 2006); *United States v. Zimmer*, 299 F.3d 710, 717 (8th Cir. 2002).

|     |                      |         |
|-----|----------------------|---------|
| (B) | More than $2,000     | add 1   |
| (C) | More than $5,000     | add 2   |
| (D) | More than $10,000    | add 3   |
| (E) | More than $20,000    | add 4   |
| (F) | More than $40,000    | add 5   |
| (G) | More than $70,000    | add 6   |
| (H) | More than $120,000   | add 7   |
| (I) | More than $200,000   | add 8   |

USSG §2F1.1(b)(1). The USPO recommends that a seven-level increase is appropriate because "the loss" for purposes of USSG §2F1.1 was $125,343.02. The government agrees with this assessment.

The "loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred." USSG §2F1.1, cmt. (n.8). "[I]f an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." *Id.*; *cf. United States v. Porter*, 417 F.3d 914, 917 (8th Cir. 2005) (applying USSG §2B1.1 and remarking that "the amount of the loss is the greater of the actual or intended loss"). In a bankruptcy fraud case, oftentimes "[t]he focus of the loss calculation under section 2F1.1 'should be on the amount of possible loss the defendant intended to inflict on the victim.'" *United States v. Dolan*, 120 F.3d 856, 870 (8th Cir. 1997) (quoting *United States v. Prendergast*, 979 F.2d 1289, 1292 (8th Cir. 1992)). "[T]he district court should use the probable or intended loss the defendant meant to inflict, if that amount can be determined and if it is larger than the amount of the actual loss." *Id.* (citing *United States v. Anderson*, 68 F.3d 1050, 1054 (8th Cir. 1995)). "The district court should calculate the actual or intended loss amount by using either the value of the assets concealed or the value of the debtor's liabilities, whichever is less." *Id.* (citing *United*

4

*States v. Edgar*, 971 F.2d 89, 95 (8th Cir. 1992)).[4]

The government bears the burden to prove the amount of loss by a preponderance of the evidence. *See United States v. Russell*, 234 F.3d 404, 408 (8th Cir. 2000) ("At sentencing, the government has the burden of proof on disputed facts, and generally must satisfy a preponderance of the evidence standard."); *United States v. Joetzki*, 952 F.2d 1090, 1096 (9th Cir. 1991) (holding same for §2F1.1 "loss" calculations). The amount of the loss, however, need not be determined with precision. USSG §2F1.1, cmt. (n.9); *cf. United States v. French*, 46 F.3d 710, 715 (8th Cir. 1995) (interpreting §2B1.1). "The court need only make a reasonable estimate of the loss, given the available information." USSG §2F1.1, cmt. (n. 9). "The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." *Id.*[5]

## 2. *Application*

As the court instructed the jury, the commencement of a bankruptcy case creates a bankruptcy estate. 11 U.S.C. § 541(a)(1). The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.* The estate also includes all "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." *Id.* § 541(a)(6). The government contends that Defendant fraudulently concealed the following assets from his creditors:

---

[4] Defendant sought discharge of nearly $900,000 in debts. This figure is significantly higher than any allegation of actual loss or intended loss. Therefore, only actual and intended losses are discussed.

[5] The Application Notes to USSG §2F1.1 state that "[v]aluation of loss is discussed in the Commentary to §2B1.1." USSG §2F1.1, cmt. (n.1). That section of the sentencing guidelines reiterates much of, and is consistent with, the foregoing discussion of USSG §2F1.1.

$8,980.83 in F&M Bank Loan Payments, $5,200 in F-150 truck loan payments and a $111,162.19 ownership interest in a corporation, WFI Bamboo.

### a. Bank Loan and Truck Loan

The total amount of the fraudulently concealed F&M bank loan payments is $8,980.83. To arrive at this total, one must add up the first six checks listed on Page 8 and Page 9 of the Post-Trial Motions Order.[6] *See Mitchell*, 2006 WL 20583, at *3-*4. The last check is not included in the total because the government concedes that Defendant was not required to disclose it in his bankruptcy petition. *See id.* at *4 n.5.

The total amount of the fraudulently concealed F-150 truck loan payments is $5,200. To arrive at this total, one must add up the first four checks shown on Page 10 of the Post-Trial Motions Order. *See id.* at *4. The last check is not included in the total because the government concedes that Defendant was not required to disclose it in his bankruptcy petition. *See id.* at *4, n.6.

Defendant claims that, even if he fraudulently concealed the debt payments on the F&M loan and the F-150 truck loan, there was no "loss" to his creditors. Defendant points out that (1) the state and federal taxing authorities had outstanding tax liens that had priority over all of his creditors and (2) the F-150 truck and the F&M loan were listed in his bankruptcy petition.

Defendant's arguments lack merit. Even if the court were to assume that the outstanding tax liens and the listing of the F-150 truck loan and the F&M bank loan somehow vitiated any actual loss that Defendant's lies caused his creditors, actual loss is not the only rubric for determining loss under USSG §2F1.1. "[T]o determine the amount of loss caused by a defendant's bankruptcy fraud, the district court should use the probable

---

[6] There is a clerical error in the PSIR that results in a $0.30 discrepancy with the figure in the Post-Trial Motions Order.

or intended loss the defendant meant to inflict, if that amount can be determined and if it larger than the amount of the actual loss." *Dolan*, 120 F.3d at 870 (citations omitted). To determine the intended loss, the court must ordinarily consider "the value of the assets concealed." *Id.*

The court finds, by a preponderance of the evidence, that Defendant intended to cause his creditors to lose $14,180 (i.e., the total of the payments on the F&M loan and the F-150 truck loan he hid). The court finds Defendant failed to disclose these payments in his bankruptcy petition with the intent to avoid his creditors and cause them to lose $14,180. The court is "not bound to accept [a defendant's] self-serving assertions at sentencing that he intended no loss to his creditors." *Id.* at 871.

Accordingly, the court shall find that the "loss" for purposes of USSG §2F1.1(b)(1) is at least $14,180.

### b. WFI Bamboo

The more difficult question in this sentencing proceeding concerns valuing WFI Bamboo. Matters are further complicated by the fact that the court must assess the value of the business as of July 11, 2000, the date Defendant signed his bankruptcy petition.

The USPO contends that Defendant's ownership interest in WFI Bamboo in 2000 was $111,162.19. The government agrees with this assessment. Defendant contends that (1) he did not own WFI Bamboo and (2) in any event, the government failed to prove that the value of his alleged ownership interest in WFI Bamboo was $111,162.19.

The court need not make a finding as to whether the government proved that Defendant owned WFI Bamboo by a preponderance of the evidence. Even if the court assumes that Defendant owned WFI Bamboo, the court finds that the government failed to prove by a preponderance of the evidence that Defendant's ownership interest in WFI Bamboo had any value or that Defendant believed that WFI Bamboo had any value worth

7

hiding from his creditors. The court, therefore, declines to add $111,162.19 into Defendant's "loss" calculation under USSG §2F1.1.

The government's evidence on this issue consisted of (1) a statement by Defendant's ex-wife, Kathy Bigelow, f/k/a Kathy Mitchell, that "things were going great" at WFI Bamboo in 2000 and (2) an unaudited financial statement, dated January of 2001, which indicates that during the year 2000 WFI Bamboo had a net income of $222,324.38. The government claims that Defendant owned at least 50% of WFI Bamboo,[7] and, therefore, contends his concealed ownership interest was worth $111,162.19, i.e., half of WFI Bamboo's net income in 2000. The government did not present any expert testimony regarding the valuation of WFI Bamboo.

Defendant presented expert testimony on the issue of valuation. Brendon Murphy, a cash management officer at Guaranty Bank, testified that there are a number of different ways to value a company. Based on his education, training, background and experience, Mr. Murphy testified that the government's "income approach" was inappropriate because WFI Bamboo was a new company and had only two years of financial statements.

The same unaudited financial statement indicates that, in 2000, WFI Bamboo had assets of $403,888.52 and liabilities of $438,234.05. Mr. Murphy believed the value of WFI Bamboo in 2000 was -$34,265.53, or its net equity.

Mr. Murphy opined that WFI Bamboo was "excessively debt burdened." Mr. Murphy pointed out that WFI Bamboo had retained earnings of -176,565.65. These negative retained earnings indicate that "the ownership of the company had to invest an additional $176,000 to make ends meet."

---

[7] At trial the government contended Defendant owned 75% of WFI Bamboo. The USPO adopted a "conservative" ownership interest of "at least" 50%, which the government does not dispute.

In 2001, Mr. Murphy, acting as a loan officer for Guaranty Bank, declined to loan WFI Bamboo $100,000. In December of 2002, WFI Bamboo filed for bankruptcy.

There is very little case law regarding how to value a corporation for purposes of calculating "loss" under USSG §2F1.1. In *United States v. Wheeldon*, 313 F.3d 1070 (8th Cir. 2002), the Eighth Circuit Court of Appeals noted in dicta that the fact that a defendant sold his business for $8,500 two months after the filing of his bankruptcy petition was "certainly some evidence of what the business was worth." *Wheeldon*, 313 F.3d at 1073; *see also United States v. Saacks*, 131 F.3d 540, 542-43 (5th Cir. 1997) (business sold for $75,000). That said, the court indicated this figure was "not necessarily conclusive." *Wheeldon*, 313 F.3d at 1073. Unlike *Wheeldon*, Defendant did not sell his business shortly after he filed for bankruptcy so its market value is more difficult to calculate.

The court finds Mr. Murphy's testimony to be the most credible evidence offered in this case regarding the value of WFI Bamboo in 2000. The government's calculations ignore WFI Bamboo's equity position and its future earning capacity. Although the net equity in 2000 is a known quantity (-$34,265.53), the government did not present any evidence regarding the future earning capacity of WFI Bamboo in 2000. For example, the government did not present evidence on what the bamboo flooring market was like in 2000. The court also finds the fact that WFI Bamboo went bankrupt little more than two years after Defendant's personal bankruptcy commenced is some evidence that WFI Bamboo was not as valuable as the government alleges.

It is true that "the loss need not be determined with precision," USSG §2F1.1, cmt. (n. 9), and "[t]he court need only make a reasonable estimate of the loss, given the available information." *Id.* That said, the court cannot engage in unbridled speculation. *Cf. United States v. 75.13 Acres of Land, More or Less, Situated in Polk County, Iowa*, 693 F.2d 813, 816 (8th Cir. 1982) (recognizing that capitalization of future income is an

9

appropriate method of valuation in some cases, but it should not be used when the extent of the future use or demand for it is speculative). The government bears the burden to prove the amount of loss, and the court shall hold the government to that burden. The government has failed to prove WFI Bamboo had any value in 2000. The government has not proved any actual or intended loss, and certainly has not shown over $100,000 worth of loss.

### c. Disposition

The court finds, by a preponderance of the evidence, that Defendant intended to cause his creditors a "loss" of $14,180 (i.e., the total of the payments on the F&M loan and the F-150 truck loan that he failed to disclose in his bankruptcy petition). This merits a three-level increase, as it is a loss exceeding $10,000. *See* USSG §2F1.1(D) (stating that a loss in excess of $10,000 but less than $20,000 results in a three-level increase).

### B. Scheme to Defraud More Than One Victim

The second issue the court must decide is whether to impose a two-level increase pursuant to USSG §2F1.1(b)(2)(B) for an offense that involved a scheme to defraud more than one victim. In pertinent part, USSG §2F1.1(b)(2)(B) states that "[i]f the offense involved . . . a scheme to defraud more than one victim, increase by 2 levels." USSG §2F1.1(b)(2)(B). Defendant claims there was no scheme to defraud and there were no victims.

A "'[s]cheme to defraud more than one victim' . . . refers to a design or plan to obtain something of value from more than one person." USSG §2F1.1, cmt. (n.4). "'Victim' refers to a person or entity from which the funds are to come directly.'" *Id.* "[T]he relevant commentary [to §2F1.1] makes clear that the primary victims of a bankruptcy fraud, for the most part, are the individual creditors." *United States v. Shadduck*, 112 F.3d 523, 531 (1st Cir. 1997). In addition, a bankruptcy trustee "may be

victimized directly by a bankruptcy fraud to the extent it deprives the estate of assets otherwise subject to administration." *Id.*

The court finds the instant offense involved a scheme to defraud multiple victims, including the bankruptcy trustee, three secured creditors, four creditors holding unsecured priority claims and fifty-nine creditors holding unsecured priority claims. Defendant had a scheme to use the bankruptcy process fraudulently. He attempted to have his debts discharged, while keeping some assets which should have been turned over to his creditors to satisfy those debts. By fraudulently concealing his income, Defendant tried to illegally keep property of the bankruptcy estate which would otherwise be subject to administration for the benefit of creditors. *See id.* In this sense, Defendant had a design or plan to obtain something of value from multiple persons. *See id.* n. 13; *cf. United States v. Pizano*, 421 F.3d 707, 724-25 & 724 n.6 (8th Cir. 2005) (approving of defining "scheme to defraud" for purposes of 18 U.S.C. § 1344 (bank fraud) as "any plan or course of action intended to deceive or cheat another out of money or property by employing material falsehoods, concealing material facts, or omitting material facts"); *accord* Eighth Circuit Model Jury Instruction 6.18.1341 (2005) (using similar language).

Accordingly, the court finds that the offense of conviction involves a scheme to defraud more than one victim. As such, a two-level increase is warranted under USSG §2F1.1(b)(2)(B).

### C. *Fraud in a Judicial Proceeding*

Third, the court must decide whether to impose a two-level increase pursuant to USSG §2F1.1(b)(4)(B) for an offense that involved a violation of a judicial process. In pertinent part, USSG §2F1.1 provides:

> If the offense involved . . . [a] violation of any judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines, increase by 2 levels.

USSG §2F1.1(b)(4)(B). Defendant contends that he did not violate a judicial order when he lied on his bankruptcy petition. In the alternative, Defendant claims that increasing his sentence pursuant to USSG §2F1.1(b)(4)(B) would result in impermissible "double counting" because "[t]o the extent there is some violation of judicial process, it is inherent in the count and conduct of conviction . . . ."

The Eighth Circuit Court of Appeals has repeatedly addressed and rejected Defendant's arguments. Sentencing Guideline Section 2F1.1(b)(4)(B) clearly applies to cases involving fraudulently concealing assets in a bankruptcy proceeding, because in concealing assets on his bankruptcy petition, a defendant violates a "judicial . . . process." *United States v. Lloyd*, 947 F.2d 339, 340 (8th Cir. 1991); *see also United States v. Mohamed*, 161 F.3d 1132, 1136 (8th Cir. 1998) (recognizing that six circuit courts of appeals have held that "the act of concealing assets when filing a bankruptcy petition suffices to warrant a two-level enhancement") (citing *United States v. Guthrie*, 144 F.3d 1006, 1010 (6th Cir. 1998) ; *Saacks*, 131 F.3d at 545-46; *United States v. Messner*, 107 F.3d 1448, 1457 (10th Cir. 1997); *United States v. Welch*, 103 F.3d 906, 908 (9th Cir. 1996); *United States v. Michalek*, 54 F.3d 325, 332-33 (7th Cir. 1995) and *United States v. Bellew*, 35 F.3d 518, 520 (11th Cir. 1994)). *But see United States v. Thayer*, 201 F.3d 214, 226-30 (3d Cir. 1999) (reaching opposite conclusion). There is no "double counting" because the base offense level only takes into account the act of fraudulent concealment, not the additional fact that it occurred in a judicial proceeding. *United States v. Cheek*, 69 F.3d 231, 233 (8th Cir. 1995). Defendant's "abuse of the bankruptcy process makes him more culpable, and thus distinct from, others who have committed offenses under §2F1.1." *Id.*[8]

---

[8] In November 2000, the United States Sentencing Commission resolved the circuit (continued…)

Accordingly, the court shall find that Defendant is subject to a two-level increase pursuant to USSG §2F1.1(b)(4)(B) for an offense that involved a violation of a judicial process.

### D. Obstruction of Justice

Fourth, the court must decide whether to impose a two-level increase pursuant to USSG §3C1.1 for obstruction of justice. At the Hearing, Ms. Bigelow, Defendant's ex-wife, testified that she was scared to testify. She stated that her daughter, Miss Callie Mitchell, relayed a threat to her from Defendant. According to Ms. Bigelow, Miss Mitchell came over to her house on Mother's Day, presented her with a dozen roses and told her that she "was not to show up here or something would happen, and [she] better be careful." Defendant allegedly told Miss Mitchell to tell her mother that she had "better watch [her] back." Ms. Bigelow stated that, due to the message from Defendant, she has stopped attending classes and does not go into public places. Ms. Bigelow also alleged that Miss Mitchell called her before Defendant's trial and told her that she "better not show up."

Miss Mitchell disputed her mother's testimony. Miss Mitchell testified that Defendant did not ask her to relay a threat to her mother. Miss Mitchell claimed that she overheard Defendant at work tell a man named Hugo, a Chinese businessman, "that my mom was being subpoenaed into this court case, and that she . . . should watch out what

---

[8](…continued)
split in favor of the Eighth Circuit Court of Appeals' view. A specific provision was added granting a two-level enhancement if the offense involved "a misrepresentation or other fraudulent action during the course of the bankruptcy proceeding." USSG §2F1.1(b)(4)(B) (2005). Thus, regardless of whether the court views the guidelines, as interpreted in the Eighth Circuit, before or after this change, Defendant is subject to a two-level increase.

13

she was going to say because they were going to turn it around on her, and that she should plead [the Fifth Amendment] just to protect herself."[9] Miss Mitchell stated that, on Mother's Day, she told her mother what she overheard. Miss Mitchell stated that Defendant did not know Miss Mitchell was going to speak with Ms. Bigelow and denied telling her mother that she was in physical danger. Miss Mitchell denied that Defendant had ever asked her to pass messages on to her mother.

Section 3C1.1 provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

USSG §3C1.1. Threatening a witness from testifying clearly falls within the ambit of this provision. *See, e.g., United States v. Davis*, 357 F.3d 726, 729 (8th Cir. 2004) (holding two-level adjustment warranted for threatening witnesses, as such threats were "calculated to impede a criminal investigation and therefore constituted an obstruction of justice"), *rev'd on other grounds*, 543 U.S. 1099 (2005); *United States v. Campbell*, No. 00-1715, 2000 WL 1617926, at *1, 242 F.3d 377 (8th Cir. 2000) (unpublished table disposition) (holding two-level adjustment for obstruction of justice was appropriate because the defendant threatened his father from testifying at trial). The government bears the burden

---

[9] Ms. Bigelow admitted at the Hearing that she filed a number of false tax returns. Ms. Bigelow repeatedly stated that she signed "whatever I was told to" sign by others, including Defendant. Ms. Bigelow stated that she told her attorneys, Kevin Collins and Carroll Reasoner of the law firm of Shuttleworth & Ingersoll, that the information in her tax returns were false and "forged," but they told her to certify the information anyway.

14

"to prove the facts necessary to support this enhancement." *United States v. Ransom*, 990 F.2d 1011, 1013 (8th Cir. 1993) (citing *United States v. Willis*, 940 F.2d 1136, 1140 (8th Cir. 1991)).

The court finds that the government has failed to prove, by a preponderance of the evidence, that Defendant attempted to willfully obstruct the administration of justice. Although the court does not disbelieve Ms. Bigelow's testimony that she is frightened of Defendant or her impressions of her daughter's Mother's Day message, the court is not sufficiently convinced that Defendant knowingly asked his daughter to convey a threat. It is equally probable that Miss Mitchell simply overheard Defendant speak, and, therefore, Defendant did not willfully obstruct the administration of justice. Accordingly, the court shall not increase Defendant's offense level by two levels pursuant to USSG §3C1.1.[10]

---

[10] In order to impeach Ms. Bigelow's credibility, Defendant offered into evidence Ms. Bigelow's medical records ("Exhibit S-5"). At the Hearing, the court reserved ruling on whether to admit Exhibit S-5, because of concerns that Defendant had obtained the records through illegal and fraudulent conduct. Defendant pled guilty to a simple misdemeanor in state court for fraudulently obtaining Ms. Bigelow's medical records in order to use them against her in their dissolution action. The court afforded defense counsel the opportunity, however, to file a supplemental brief to explain the origin of the medical records.

On June 16, 2006, Attorney Peter Riley notified the court that he "does not know" whether the medical records were obtained improperly, but does know that he did eventually obtain a full copy of the records legally through discovery in the dissolution action. The court credits Mr. Riley's assertions and finds the documents admissible. Admitting the documents is of no moment in this case, however, because the court does not rely upon them in its assessment of Ms. Bigelow's credibility. The court finds Ms. Bigelow's testimony regarding the obstruction of justice issue is credible, so far as it goes. Exhibit S-5 shall remained sealed.

## V. CONCLUSION

When sentencing resumes, the court shall find that Defendant's base offense level under the advisory Sentencing Guidelines is **6**. USSG §2F1.1(b)(1)(a). The court shall find that Defendant is subject to a **three**-level increase pursuant to USSG §2F1.1(D) for intending a loss exceeding $10,000, a **two**-level increase pursuant to USSG 2F1.1(b)(2)(B) for an offense involving a scheme to defraud more than one victim and a **two**-level increase pursuant to USSG §2F1.1(b)(4)(B) for an offense that involved a violation of a judicial process. This shall result in an adjusted offense level of **13**. Because Defendant is Criminal History Category I and no other adjustments apply, the court shall find Defendant's advisory Sentencing Guidelines range is 12-18 months. *See* USSG Appendix A.

**IT IS SO ORDERED.**

**DATED** this 22d day of June, 2006.

_____
LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA